JANE FINNEGAN, by next friend, etc., *v.* ROBERT FINNEGAN and others.

## October Term, 1877.

HUSBAND AND WIFE — EFFECT OF COERCION OF HUSBAND ON THE RIGHTS OF AN INNOCENT PURCHASER. — Although the probate by privy examination of a wife's deed may be impeached for fraud, or undue influence of the husband, and the conveyance set aside therefor as against the husband, or any person participating therein, or having knowledge thereof, or claiming exclusively through the husband, yet, whatever be the wrongful influence of the husband, if the grantee, dealing directly with the wife, has conducted himself in good faith, without suspicion of the wrong perpetrated, and has paid a substantial consideration, the transaction will be binding on her, and the grantee's rights protected, even if a part of the price be an antecedent debt of the husband.

*Merritt*, for complainant.
*Wilkin*, for defendants.

THE CHANCELLOR: — This bill was filed on August 7,. 1876, to set aside a deed to a house and lot in Edgefield,. the separate property of the complainant, made on August 12, 1874, by the defendant Robert Finnegan and the complainant, his wife, to George A. Dickel & Co., a firm composed of the other defendants, George A. Dickel, Meier Sulzkotter, and Emanuel Schwab. The relief sought is based upon the ground that the instrument was executed by the complainant without knowledge of its contents,. under duress of the husband, the defendants Dickel & Co. being " equally active " with the husband in the coercion.

The facts disclosed by the record fail to implicate the defendants Dickel & Co. in any coercion, if coercion there was, and differ materially from the vague averments of the bill. Robert Finnegan came from Albany, New York, to Nashville, in 1864, his family following him a few months afterwards. He was employed as a barkeeper in different saloons kept for the sale of liquors. In May, 1867, Dickel & Co. purchased the fixtures of a saloon, and established Finnegan in business, furnishing him with a stock of liquors, and taking his notes, payable monthly, for the entire consideration. These notes were paid at maturity, Finnegan continuing the business, and buying his supplies principally from his co-defendants. The most friendly relations existed between the parties, the defendant Finnegan always speaking of Dickel & Co. as his best friends, and the latter treating him as one of their best customers. Finnegan was usually in debt to his co-defendants, and made payments from time to time on his account. On August 30, 1872, his indebtedness to them amounted to $556.

On that day, and without the knowledge of Dickel & Co., the defendant Finnegan bought the house and lot in controversy, paying in cash $1,895, and giving his two notes, of that date, at one and two years, with interest, for $875 each, for the residue of the purchase-money, these

notes being secured by a lien retained upon the land.   By Finnegan's direction, the vendor conveyed the lot to the complainant, "to be held, used, and enjoyed by her in her sole and separate right, with full power to convey the same, by deed, will, or otherwise, as perfectly as she might do if a *feme sole*."   The payments made by Finnegan on this property prevented him from meeting his liabilities to Dickel & Co. as promptly as he had been in the habit of doing.   On July 1, 1873, his indebtedness to them had run up to $741.96, although in the meantime he had made payments which would, except for the additional purchases, have paid off the indebtedness of August 30, 1872.   Dickel & Co. having, about July 1, 1873, ascertained that Finnegan had bought the lot in controversy, and taken the title to his wife, declined to make further sales to him on credit. They continued, however, to sell him supplies for cash, taking his note for the amount due, as above.   On September 2, 1873, at the urgent request of Finnegan, Dickel & Co. paid $364, the balance then due upon the first note given for the lot, and took up the note.   This payment was made by a check on the Fourth National Bank, payable to the order of Robert and Jane Finnegan, and by them indorsed.   On January 1, 1874, Finnegan paid Dickel & Co. $64, and the interest then due on this payment, and he and his wife, the complainant, joined in executing to them an instrument in writing, reciting the facts, promising to pay the remaining $300, with interest at the rate of ten per cent, at the expiration of twelve months, and expressly agreeing that the debt thus evidenced should be "a lien upon said property until the same is paid."   This instrument was acknowledged and registered, the privy examination of the wife being had.   Afterwards, Finnegan, finding himself unable to meet the last note given for the land, endeavored to resell the property, employing real-estate agents for the purpose, but was unable to find a purchaser at the price limited.   He was also pressed by his landlord for the rent

of his saloon and residence, which he had allowed to fall in arrear. In this state of affairs, about August 12, 1874, Finnegan and wife sent for Emanuel Schwab, explained the circumstances, and proposed, if Dickel & Co. would take up the last note and advance in cash enough money to pay taxes and arrears of rent, to sell them the land, satisfy the debt due Dickel & Co., and take the balance of the purchase-consideration in stock for the saloon business. The cash required for taxes and rent was fixed at $200. The land was valued by Finnegan and wife at $3,500, but Dickel & Co. would only agree to pay $2,600. They said, however, that they did not want the property, and would agree that if, at any time within two years, Finnegan and wife could find an opportunity to sell the place for more money, they could do so, and have the benefit of the difference between $2,600, with interest at the rate of ten per cent, and the price obtained, and also the rents, less taxes and repairs. Dickel & Co. insisted, however, upon an absolute deed, and at first required Finnegan and wife to rely upon their honor for carrying out the rest of the agreement. This was afterwards yielded, upon the lawyer employed to draw the deed suggesting that he could so word the agreement as to make the deed absolute after the expiration of the two years. The deed to the lot was acknowledged by Finnegan and wife, her privy examination being taken according to law, and the agreement for repurchase or redemption within two years was signed by Dickel & Co., and by Finnegan and wife, and left with one of the two witnesses who attested it. There is not the slightest evidence of any bad faith, improper motive, or wrongful conduct on the part of Dickel & Co., or any member of the firm, towards the complainant or her husband, in the whole transaction. There is nothing to implicate them in any fraud or coercion by the husband to influence his wife, if either was used. The question then is, whether evidence tending to impeach the

conduct of the husband in these respects, in this transaction, is, under the circumstances, admissible against Dickel & Co.

It has long been settled, in this state, that, although equity cannot inquire into the regularity of the privy examination of a married woman, touching the execution of a deed taken in a court of law, yet the probate may be impeached for fraud. *Campbell* v. *Taul*, 3 Yerg. 548. This is in accord with the current of authority. *Central Bank* v. *Copeland*, 18 Md. 305; *Eyster* v. *Hatheway*, 50 Ill. 521; 2 Bishop's Mar. Wom., sec. 482. And it is clear that any undue influence exerted by the husband, by reason of his power over the person or property of the wife, which renders her not a free agent in the transaction, is sufficient to set it aside as to him, or any person participating therein, or having knowledge thereof. *Fry* v. *Fry*, 7 Paige, 461; *Wilson* v. *Bull*, 10 Ohio, 250; *Fisk* v. *Stubbs*, 30 Ala. 335; *Witbeck* v. *Witbeck*, 25 Mich. 439; *Tapley* v. *Tapley*, 10 Minn. 448. Such influence is also sufficient to avoid the transaction as to any person claiming under the husband exclusively, and where the husband is the agent of such person expressly, or by fair inference from the circumstances. As, for example, where a mortgage has been procured from the wife by the husband, to secure a preëxisting debt due by him to the mortgagee, the latter never having seen the wife on the subject. *Central Bank* v. *Copeland*, 18 Md. 305. But the weight of authority is, and, as Mr. Bishop concedes, correctly on principle, although a little hard on the wife, that, whatever be the wrongful influence exerted on her mind by the husband, if the grantee has conducted himself in good faith, without suspicion of the wrong which is being perpetrated, and has paid an adequate valuable consideration for the conveyance, the transaction directly with the wife will be binding on her, and the grantee's rights protected. *White* v. *Graves*, 107 Mass. 325; *Rexford* v. *Rexford*, 7 Lans. 6; 2 Bishop's Mar.

Wom., sec. 483. And this rule was applied to the protec-- tion of a *bona fide* sub-grantee of a fraudulent grantee of the husband and wife, by our Supreme Court, in *Coleman* v. *Satterfield*, 2 Head, 259.

Under the power of disposition vested in the wife by the deed in this case, the conveyance by the wife would have been good, the question of duress out of the way, even if made to secure or pay the husband's debt. *Hodges* v. *Williams*, Com. Rep. of September 23, 1875; *Lightfoot* v. *Bass*, 2 Tenn. Ch. 681. The deed was made, however, upon a valuable consideration passing at the time as to all of the purchase-price, except the balance of the husband's note of July 1, 1873, for groceries, which was $700. The residue of the consideration consisted of money advanced to pay the notes given by Finnegan for the land, and secured by a lien thereon, cash to pay taxes and rent, and merchan-- dise for the saloon. The conveyance is, therefore, upon the principles settled by the decisions, good against the wife, even if she acted under the husband's duress, to the full extent of the consideration, unless, it may be, as to the sum of $700, the preëxisting debt of the husband. A con-- veyance of land in payment of a preëxisting debt alone does not, in this state, put the grantee in the position of a pur-- chaser for value, nor entitle him to the protection of this court against prior equities. *Cook* v. *Cook*, 3 Head, 722; *Anderson* v. *Taylor*, 1 Tenn. Ch. 442. The same law pre-- vails in New York and New Jersey. *Dickerson* v. *Tilling-hast*, 4 Paige, 215; *Mingus* v. *Cordett*, 8 C. E. Green, 313. But the proof is clear that Dickel & Co. went into the trade, and became purchasers of the property by the ad-- vance of the new consideration, in order to obtain security for the debt already due them from the husband. The rule in such cases, both in assignments of personal securities and conveyances of realty, is, that the payment of a substantial part of the price in advances at the time will render the

assignee or grantee a purchaser for value, although the residue of the consideration consists of an antecedent debt which is satisfied by the conveyance; and the presumption is, that the purchaser made the new advance for the purpose of obtaining the additional security for the antecedent debt. *Gliddon* v. *Hunt*, 24 Pick. 221; *Percival* v. *Frampton*, 2 Crompt. M. & R. 180; *Baggaly* v. *Gaither*, 2 Jones Eq. 80. The reason is, that the grantee is a *bonâ fide* purchaser by the new consideration, and his rights as such should. not be impaired by the fact that he was induced to become the purchaser in order to secure the payment of the preëxisting debt. It is enough that the new consideration constitutes a substantial part of the price paid.

Whether, therefore, the deed in controversy be treated as an absolute sale, with liberty to repurchase within a given time, or a mortgage based upon the new consideration, the defendants Dickel & Co. are *bonâ fide* purchasers for value, without suspicion of any wrong perpetrated by the husband on the wife, and without any circumstances tending in the least to excite suspicion. . On the contrary, all the circumstances tended to show a unity of feeling and interest in the husband and wife. The only payment which had been made on the land was made by the husband, out of funds which ought to have been used in paying for the stock to run his business. The wife had no separate estate out of which to pay for the property, and the husband no income except that derived from his business. They were unable to pay the whole of the first note given for the property, and had obtained the money from the defendants. They had no means with which to pay the second note, and a sale of the property was a necessity. The wife knew the fact as well as the husband, and the proof leaves not a particle of doubt in my mind that she fully understood the circumstances, and actively participated in the preliminary negotiations and the final sale. It is not a case, therefore, where

the husband was the sole acting party, and where the transaction was entirely for his benefit. In such a case, the husband might well be treated as the agent of the purchaser. In this case, he was the agent of the wife in all things, if any such there be, in which she did not act for herself. There is no pretence for holding Dickel & Co. implicated in any thing which may have been done by the husband improperly to influence his wife. The case falls within the rule, recognized by all the authorities, which protects third persons dealing with the husband and wife, whatever may have been the conduct of the former to the latter.

The conclusion thus reached renders it unnecessary critically to review the evidence on which the charge of coercion by the husband is sought to be rested. In brief, I may say the proof does not satisfy me that there was any coercion by the husband. Although he has, probably, ruined himself by his habits of intoxication, I think I can dismiss him from the court without any stain on his character as an indulgent husband and father.

The only remaining question is, whether the transaction of August 12, 1874, was a sale with liberty to repurchase, or a mortgage. But the defendants have treated it throughout as a sale with liberty to repurchase, and the complainant, in view of the depreciation of real estate since that date, has elected, in the event I should come to the conclusion I have, to treat it in the same way. Under the peculiar wording of the agreement, this will give the complainant the benefit of the rents for the two years, less the taxes and repairs. The rights of the parties will be declared accordingly, and an account ordered.